## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**LUNDELL FARMING COMPANY, L.P.,** *et al.*                    **PLAINTIFFS**

**v.**                    **CASE NO. 4:19-CV-00594-BSM**

**UNITED STATES ARMY CORPS**
**OF ENGINEERS,** *et al.*                    **DFENDANTS**

### <u>ORDER</u>

The U.S. Army Corps of Engineers's (the "Corps") decision to refrain from intervening in the lower Cache River Restoration Project violates the Administrative Procedures Act because it was made arbitrarily and capriciously.  A *de novo* review of the record reveals that there is compelling evidence that the City of Clarendon is failing to perform operation, maintenance, repair, replacement, and rehabilitation ("maintenance") as required by the project partnership agreement.  This matter is remanded to the Corps to take action consistent with a finding that the city is not performing maintenance.  Plaintiffs' request for an injunction compelling the Corps to perform maintenance, however, is denied.

### I. BACKGROUND

In the early 1970s, the Corps began channelizing the lower Cache River to control flooding and to allow for agricultural and economic development of the Cache River Basin.  Admin. R. at 148, Doc. No. 42.  Congress authorized this 231-mile project under the Flood Control Act of 1950.  In 1973, environmental litigation halted work on the project.  *Id*. at 256.  Ultimately, the Corps was only able to channelize seven miles of the river just north of Clarendon, Arkansas.  *Id*. at 148.  The seven-mile channelization isolated six of the river's

historic meanders, changing them from flowing river into standing backwater.  *Id*.  Plaintiffs own property along this channelized portion of the Cache River.

In 1986, Congress passed the Water Resources Development Act, 33 U.S.C. § 2309a. Section 1135 of the Act authorized the Corps to modify existing water resources projects "for the purpose of improving the quality of the environment in the public interest[.]"  33 U.S.C. § 2309a(a).  Section 1135 only allows modifications that "do not impair or substantially change the purpose or functions of the specifically authorized project."  Admin. R. at 84; *see also* 33 U.S.C. § 2309a(b) (modifications must be "consistent with the authorized project purposes").  The Corps is required to partner with a non-Federal sponsor to exercise its Section 1135 authority.  Admin. R. at 86–87, 120.  Design and implementation costs of Section 1135 projects are shared between the Corps (75%) and the non-Federal sponsor (25%).  *Id.*; 33 U.S.C. § 2309a(d).  Once a Section 1135 project is completed, the Corps provides a maintenance manual to the non-Federal sponsor, who assumes full responsibility for maintenance costs and usually performs the work.  Admin. R. at 98, 121.

In 2004, the Arkansas Game and Fish Commission ("Game and Fish") and Ducks Unlimited asked the Corps to pursue a Section 1135 project to restore certain meanders that were isolated from the drainage channel of the Cache River, because the loss of natural hydrology from the original project had degraded the fish and mussel habitat in the river.  *Id*. at 148, 151, 221–23.  Five years later, the Nature Conservancy requested to become the non-Federal sponsor for the proposed restoration project.  *Id*. at 224.  The Corps evaluated various

plans for carrying out the project. *Id*. at 132–623. Following this study, the Corps, Game and Fish, Ducks Unlimited, and the Nature Conservancy agreed on a plan to restore three of the historic river meanders. *Id*. at 225. The Corps amended the plan to restore only two meanders due to financial constraints. *Id*. at 732–34. The restoration plan involved removing earthen plugs installed in the meander openings during the original project and constructing rock weirs to redirect the river flow into the meanders. *Id*. at 604–605. The Corps recognized that this plan could not reduce the flood-control benefits of the original authorized project. *Id*. at 274, 607.

When it was evaluating the restoration plan, the Corps recognized several risks if project maintenance was not performed. Among these risks was that water flow exiting the restored meanders into the canal would cause scouring on the opposite canal bank. *Id*. at 284. The Corps estimated that this scouring would cause bank migration of 3.4 to 5 feet per year. *Id*. at 299, 706. From the Corps's perspective, this potential for bank migration jeopardized the project, but the Nature Conservancy decided to install protective riprap along the bank of the river to help prevent erosion and bank migration so that the project could continue. *Id*. at 676–701, 1184; *see also* at 39.

The Corps also determined that the project risked causing sediment deposits in certain areas. *Id*. at 542. It acknowledged that these sediment deposits could negatively impact the diversion of water flow to meanders and result in accretion in the canal near plaintiffs' private boat ramp. *Id*. It also identified that if sediment deposition occurred

3

disproportionately in a meander entrance, water flow could be diverted into downstream side channels that exit from the canal.  *Id*. at 540.  One of these side channels runs directly through plaintiffs' property.  *Id*. at 1013.

Notwithstanding these and other risks, the Corps's district engineer determined that the restoration plan would not impact the original flood control project because flood-state water would pass over the rock weir structures and continue to flow downstream.  *Id*. at 209. The Corps approved the restoration project in 2011.  *Id*. at 624–25.

While the Nature Conservancy was identified as the non-Federal sponsor during its study of the project, the Corps entered into a project partnership agreement ("Partnership Agreement") with the City of Clarendon ("the city"), and the city became the non-Federal sponsor.  *Id*. at 636–67.  The Partnership Agreement required the city to perform maintenance for the restoration project according to the Corps's final maintenance manual, and to do so "at no cost to the [Federal] Government."  *Id*. at 659.  The city signed a self-certification of financial capacity as required by Corps policy.  *Id*. at 124–30, 673–74, 735–36; *see also* 42 U.S.C. § 1962d-5b(b) (non-Federal sponsor must have "full authority and capability to perform the terms of [the Partnership Agreement] and to pay damages, if necessary...").

The estimated cost of designing and constructing the project was $6,624,000, and the estimated maintenance costs were $48,000 annually.  *Id*. at 143.  Just before entering into the Partnership Agreement with the Corps, the city entered into a private grant agreement with

4

the Nature Conservancy.   *Id*. at 627–35.   This agreement provided that the Nature Conservancy would grant the city over $1.5 million to cover its portion of the design and construction costs as the non-Federal sponsor.   *Id*. at 627–68.   The Nature Conservancy also agreed to periodically distribute funds to the city for its maintenance costs, with the specifics be set forth in a future agreement.   *Id*.

The restoration project was completed in 2014.   *Id*. at 806.   Two years later, the Corps provided the maintenance manual to the city.   *Id*. at 794–804.   The manual requires the city to perform annual inspections and maintenance of the meander openings, rock weirs, a cross-ditch closure, and certain warning signs.   *Id*.   Among other things, the city must ensure the meander openings are not obstructed by debris or sediment, inspect the banks upstream and downstream of the rock weirs for erosion, and make repairs to project components as needed. *Id*.   According to the manual, these obligations "represent the minimum effort necessary to maintain the functionality of the [the restoration] Project."   *Id*. at 798.

In September 2017, a lawyer representing the city notified the Corps that the Partnership Agreement violated Arkansas's Constitution and statutes, and that the city council had voted to rescind the agreement.   *Id*. at 990-91.   The city's mayor vetoed the council's vote shortly after the letter was sent.   *Id*. at 1178.   In December, the mayor signed another grant agreement with the Nature Conservancy.   *Id*. at 992-98.   This agreement provided that the Nature Conservancy would make periodic payments to the city to cover the city's maintenance costs under the Partnership Agreement, with the total payments capped

at $1.65 million.  *Id*. at 992.

In early 2018, two city residents challenged the legality of the Partnership Agreement in Monroe County Circuit Court.  *Id*. at 1019.  The court held that the Partnership Agreement violated the Arkansas Constitution because the city's Partnership Agreement obligations exceeded its revenues, and because the city's agreement to indemnify the Corps for any damages caused by the project was an unconstitutional extension of its credit.  *Id*. at 1297–98.  The circuit court declared the Partnership Agreement void and enjoined the city "from expending any funds to perform the obligations of the [Partnership Agreement] or in connection with the [restoration project]."  *Id*. at 1298.  A few days later, the city's lawyer notified the Corps that the city council unanimously voted that it would not perform its duties under the Partnership Agreement and that the Partnership Agreement was "void, unenforceable as to the City, and impossible for the city to perform."  *Id*.  at 1009.

Plaintiffs' counsel then requested that the Corps assume responsibility for maintenance of the restoration project to prevent harm to plaintiffs' property.  *Id*. at 1010–20.  The Corps met with landowners to acknowledge their concerns, but did not assume the city's maintenance obligations.  *Id*. at 1172.  Plaintiffs' lawyer wrote the Assistant Secretary of the Army for Civil Works requesting that he compel the Corps to assume responsibility of maintenance in light of circuit court's order.  *Id*. at 1196-99.  In July 2019, the secretary responded by letter explaining that the Corps had "no evidence that the non-Federal sponsor has failed to comply with its [maintenance] obligations or with any other requirements

reflected in the [Partnership Agreement].  Furthermore, the Corps cannot assume these obligations in lieu of the City."  *Id*. at 1307.

Plaintiffs contend that the secretary's letter is a final agency action subject to judicial review under the Administrative Procedures Act ("APA") and are suing the Corps for declaratory and injunctive relief.  *See* Am. Compl., Doc. No. 8.  They seek a declaration that the Corps is required to perform the city's obligations under the Partnership Agreement, and for the Corps to be enjoined from refusing to perform those obligations.  *Id.*

## II. LEGAL STANDARD

The APA permits courts to review a "final agency action."  5 U.S.C. § 704.  Agency actions are defined broadly and can include a failure to act.  5 U.S.C. § 551(13).  For an agency action to be final, it must 1) "mark the 'consummation' of the agency's decisionmaking process"; and 2) "be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted).  Actions that are totally within the agency's discretion are not reviewable.  5 U.S.C. § 701(a)(2).

A reviewing court may set aside an agency's action when the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The party bringing an APA claim must prove that the agency's actions were arbitrary and capricious. *Friends of the Norbeck v. U.S. Forest Serv.*, 661 F.3d 969, 981 (8th Cir. 2011) (citation omitted), *cert denied*, 566 U.S. 963 (2012).  Review of an agency's

action is limited to the administrative record before the agency at the time of its decision.

*Voyageurs Nat. Park Ass'n v. Norton*, 381 F.3d 759, 766 (8th Cir. 2004).

### III. DISCUSSION

A.     <u>Final Agency Action</u>

The Corps's July 2019 letter to plaintiffs is reviewable because it is a final agency action.  The first condition required to show that an agency action is final is that it must "mark the 'consummation' of the agency's decisionmaking process."  *Bennett*, 520 U.S. at 178 (citation omitted).  The letter satisfies this condition because it completed the Corps's decisionmaking process regarding whether it would assume the city's maintenance responsibilities in light of the circuit court's ruling.  The fact that the letter came from the Assistant Secretary of the Army (Civil Works), who oversees the entire the Corps, further supports plaintiffs' position that the letter was the consummation of the agency's decisionmaking process.  *See Sackett v. E.P.A.*, 566 U.S. 120, 127 (2012) (a final agency action is "not subject to further agency review").

The Corps argues that the letter is not the completion of any process because the letter suggests additional evidence could factor into a future review.  Def.'s Br. at 15, Doc. No. 44. This argument is unpersuasive because the letter does not request more information from plaintiffs or indicate that the Corps's decision is "tentative or interlocutory in nature." *Bennett*, 520 U.S. at 178.  Moreover, plaintiffs' request for intervention was based on a court order rather than materialized project risks, while the Corps's letter implies that only the

latter would be evidence of the city's failure to comply with its maintenance obligations. *See* Admin. R. at 1300–03, 1307. By telling plaintiffs that it had no evidence of the city's noncompliance, the Corps definitively ruled that the circuit court's order provided no basis for action. The possibility that the Corps could later intervene based on new information, such as actual harm to plaintiffs' property, does not make this decision indeterminate. *See U.S. Army Corps of Engineers v. Hawkes Co., Inc.*, 578 U.S. 590, 598 (2016).

The Corps also contends that its letter to plaintiffs is similar to the response letter issued in *Sisseton-Wahpeton Oyate of Lake Traverse Reservation v. United States Corps of Engineers*, which the Eighth Circuit held was not a final action under the APA. 888 F.3d 906 (8th Cir. 2018). In *Sisseton-Wahpeton*, however, the Corps's response letter was only an explanation of its earlier decisions on permit applications under the Clean Water Act and did nothing to change those earlier decisions or inflict any new injury on the plaintiff. *Id*. at 915. Here, the Assistant Secretary's letter does not explain an earlier decision but asserts the agency's final position on whether the circuit court's order justifies its intervention. *See Alaska Dep't of Env't Conservation v. U.S. E.P.A.*, 244 F.3d 748, 750 (9th Cir. 2001) (finding a final agency action when the EPA "asserted its final position on the factual circumstances" underpinning its orders, despite no enforcement action), *aff'd*, 540 U.S. 461 (2004).

The second condition required to show that an agency action is final is that it "must be one by which 'rights or obligations have been determined,' or from which 'legal

consequences will flow.'" *Bennett*, 520 U.S. at 178 (citation omitted).  This condition is satisfied because the Corps's decision effectively suspended the city's obligations under the Partnership Agreement.  This is true because the Corps declined to take action after the city flatly told the Corps that it was following the circuit court's order and would no longer perform maintenance.  The Corps's lack of action is tantamount to an affirmative statement that the city's obligation to perform maintenance is relieved.  The suspension of the city's obligation to perform maintenance has legal consequences for plaintiffs because their property is now exposed to risks that the Corps sought to mitigate by contractually obligating the city to perform maintenance.  *See Hawkes*, 578 U.S. at 599 (finding legal consequences flowed from the Corps's decision that denied mining company safe harbor from certain suits under the Clean Water Act).  It is also worth noting that the Corps's decision pressures plaintiffs to wait until maintenance deficiencies cause harm to their property, at which time their ability to obtain redress could be limited by the nature of the harm suffered, or by the Corps and the city both refusing to accept liability under the existing Partnership Agreement.  Finally, the approach taken in this analysis is consistent with the "pragmatic approach" to finality adopted by the Supreme Court in *Hawkes*.  520 U.S. at 599.

      B.    <u>Agency Discretion</u>

      Final agency actions are not subject to judicial review if they are "committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  This is a very narrow exception to the strong presumption of reviewability, and is restricted to "rare circumstances where the

relevant statute 'is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (citation omitted).  The Corps's failure to assume the city's maintenance obligations is reviewable because there is not an "absence of any statutory factors to guide the agency's decision-making process." *Friends of the Norbeck*, 661 F.3d at 975.

Congress authorized the original project to channelize the Cache River for flood-control purposes.  Years later, it permitted limited modifications to existing authorized projects for environmental improvements.  When the Corps undertook the restoration project, it was statutorily limited to measures that preserved the flood-control benefits of the original project.  The Corps was also required to enter into a written agreement with a non-Federal sponsor that possessed full authority and capability to perform its agreement's obligations, including the payment of any damages for nonperformance.  42 U.S.C. 1962d-5b(a) and (b). If the non-Federal sponsor failed to perform the terms of its agreement, the Corps was authorized to "undertake performance of those items of cooperation necessary to the functioning of the project for its purposes" after providing the sponsor notice of its failure. 42 U.S.C. § 1962d-5b(d).  The Corps's own regulations require that it "assur[e] non-Federal sponsor compliance with [agreement] responsibilities."  Admin. R. at 99.

Collectively, these authorities provide the "minimal guidance" needed to review the Corps's decision.  *South Dakota. v. Ubbelohde*, 330 F.3d 1014, 1027 (8th Cir. 2003). Nonetheless, the Corps argues that its decision was discretionary because section 1962d-

11

5b(d) states that the Corps "may" undertake performance for a failing non-Federal sponsor. While the word "may" confers discretion, the Corps's decision is reviewable because the statutes suggest it must consider whether any nonperformance by the city jeopardizes the functioning of project. *See Weyerhaeuser Co. v. U.S. Fish and Wildlife Srvs.*, 139 S.Ct. 361, 371 (2018) (statute providing that agency "*may* exclude [an] area from critical habitat" did not preclude judicial review of agency's critical-habitat designation). The Corps also argues that its decision was discretionary because it involves the allocation of lump-sum budget resources. Def.'s Br. at 17–20 (citing *Lincoln*, 508 U.S. at 191). This argument is unpersuasive because the Corps is statutorily responsible for Section 1135 modification projects, and its receipt of lump-sum appropriations should not relieve it from responsibility for an individual project that it chose to pursue. *See Rosebud Sioux Tribe v. United States*, 450 F.Supp.3d 986, 1001 (D.S.D. 2020) (noting *Lincoln* did not hold that lump-sum appropriations absolved agency of statutory duty to provide health care to Native Americans), *aff'd*, 9 F.4th 1018 (8th Cir. 2021).

     C.    Arbitrary and Capricious

     Agency actions must be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The arbitrary and capricious standard is deferential to the agency and should uphold actions except when there is no rational basis for the agency's decision. *Falk v. U.S. ex rel. Dep't of Interior*, 452 F.3d 951, 953–954 (8th Cir. 2006) (citation omitted). One aspect of arbitrary and capricious

review is whether the agency "entirely failed to consider an aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The Corps's decision to not assume maintenance responsibilities was arbitrary and capricious because its explanation for the decision runs counter to overwhelming evidence that the city is no longer performing its maintenance obligations. *See Sugule v. Frazier*, 639 F.3d 406, 411 (8th Cir. 2011). The Assistant Secretary's letter to plaintiffs stated that the Corps had "no evidence" of the city failing to comply with its maintenance obligations or other requirements of the Partnership Agreement, but that position is untenable. Admin. R. at 1307. This is true because the circuit court's order found the Partnership Agreement violated the Arkansas constitution, declared the Partnership Agreement void, and enjoined the city from expending any funds to perform its obligations under the agreement. This order followed settlement between the city and state court plaintiffs, and there is no evidence that the city has ever contested the order.

This evidence provides a sufficient basis to conclude that the city is no longer performing maintenance. But even if that conclusion was not obvious, the city dispelled any remaining doubt by notifying the Corps that it considers the Partnership Agreement illegal and is no longer performing any element of the agreement. This written notice came from

13

the city's lawyer.  Given the circuit court's order and the city's unequivocal repudiation of the Partnership Agreement, the Corps's "no evidence" explanation for its decision is genuinely baffling.  The Corps now suggests that the Nature Conservancy is providing required project maintenance and inspections, but even if this is true, the Nature Conservancy is not the non-Federal sponsor and would appear to have no legal obligation to perform maintenance.

The Corps's decision is also arbitrary and capricious because its explanation for the decision involves a misstatement of law.  Specifically, the Assistant Secretary's letter concludes by stating, "Furthermore, the Corps cannot assume these obligations in lieu of the City."  Admin. R. at 1307.  Read in context, this phrase suggests that the Corps has no authority to assume the city's maintenance obligations even if the city fails to perform.  To the contrary, the Corps has statutory authority to take over the city's responsibilities after providing notice of failure and a reasonable time for correction.  42 U.S.C. § 1962d-5b(d). The Corps argues that the statute does not authorize it to assume the city's Partnership Agreement obligations *in perpetuity*, as plaintiffs requested, but Section 1962d-5(b)(d) makes no such restriction.  Even if the statute did place limits on how long the Corps could assume the city's responsibilities, its letter to plaintiffs would still misstate the agency's authority.

D.  <u>Appropriate Remedy</u>

Having found the Corps's decision arbitrary and capricious, the appropriate remedy for plaintiffs is to remand the matter to the Corps for further consideration.  *See I.N.S. v.*

*Orlando Ventura*, 537 U.S. 12, 16 (2002) ("the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.") (citation omitted). Moreover, the Corps's reconsideration is to be conducted in light of a factual finding that the city is not performing maintenance to the restoration project as required by the agreement. The administrative record overwhelmingly supports this factual determination, and the Corps need not revisit this specific issue. *See Juan-Pedro v. Sessions*, 740 F.App'x 467, 473 (6th Cir. 2018) (declining to remand issue already considered by the BIA, and setting aside immigration judge's decision on that issue because it was not based on substantial evidence).

Plaintiffs' request for an injunction compelling the Corps to perform maintenance is denied because the statute does not require this specific remedy. The Corps points out that it may not undertake the city's maintenance responsibilities until it has notified the city of its failure and given the city a reasonable time to perform. 42 U.S.C. § 1962d-5b(d). This procedure is unnecessary because the city has already provided that notice to the Corps and failed to perform since at least 2018. Nonetheless, the statute does not require the Corps to take over the city's contractual obligation to perform maintenance. It has other options, such as suing to enforce the Partnership Agreement, renegotiating the agreement, or transferring the obligations to another non-Federal sponsor. *See* 42 U.S.C. § 1962d-5b(c). Because there is no express statutory mandate that the Corps assume the city's obligations, the agency must be given the chance to consider the circumstances, evaluate its options, and take action consistent with its statutory responsibilities for the Section 1135 program. *See Ventura*, 537

15

U.S. at 17 ("[courts] should remand a case to an agency for decision of a matter that statutes place primarily in agency hands").

## IV. CONCLUSION

For these reasons, the Corps's decision was arbitrary and capricious in violation of the APA. This matter is remanded to the Corps to take action consistent with a finding that the city is not performing maintenance for the restoration project. Plaintiffs' request for an injunction compelling the Corps to perform maintenance is denied.

IT IS SO ORDERED this 12th day of August, 2022.

_____
UNITED STATES DISTRICT JUDGE